**UNITED STATES of America,
Appellee,**

v.

**Steven Chin LEUNG, Defendant–
Appellant.**

**Docket Nos. 02–1736(L), 02–1737(CON).**

United States Court of Appeals,
Second Circuit.

Argued: Oct. 23, 2003.

Decided: March 1, 2004.

Neil M. Barofsky, Assistant United States Attorney (Meir Feder, Assistant United States Attorney, on the brief), for

James B. Comey, United States Attorney for the Southern District of New York, New York, NY, for Appellee.

Richard M. Strassberg (Eric D. Musselman, on the brief), Goodwin Procter LLP, New York, NY, for Defendant–Appellant.

Before: VAN GRAAFEILAND, B.D. PARKER, Circuit Judges, and BERMAN, District Judge.*

B.D. PARKER, Jr., Circuit Judge.

Steven Chin Leung appeals from two judgments of conviction of the United States District Court for the Southern District of New York (Denny Chin, *Judge*). Leung pleaded guilty to two counts of passport fraud in violation of 18 U.S.C. § 1542, one count of bail jumping in violation of 18 U.S.C. § 3146, and one count of obstruction of justice in violation of 18 U.S.C. § 1503. The District Court sentenced Leung principally to a term of forty-eight months' imprisonment on each count, to be served concurrently. Leung challenges his sentence. For the reasons discussed below, we affirm in part, vacate in part, and remand for resentencing.

## BACKGROUND

In March 2001, Leung fraudulently attempted to obtain a U.S. passport at the Honolulu Passport Agency in Hawaii. A criminal complaint was subsequently filed in the U.S. District Court for the District of Hawaii, a warrant issued for Leung's arrest, and Leung was arrested a month later in New York City. At Leung's initial appearance, his counsel inquired into the possibility of pleading guilty to the passport fraud charge in the Southern District of New York. *See* Fed.R.Crim.P. 20.

---

* The Honorable Richard M. Berman, of the United States District Court for the Southern District of New York, sitting by designation.

Leung and the government subsequently reached an agreement concerning the plea and the Rule 20 transfer, and Leung was released in New York on his personal recognizance. The government then filed an information in the District of Hawaii charging Leung with a single count of passport fraud in violation of 18 U.S.C. § 1542, and the case was transferred to the Southern District of New York.

After reviewing State Department files, the government learned that Leung also had fraudulently attempted to obtain a passport in New York in September 1999. After the government discovered this information, the parties negotiated an agreement addressing both passport frauds, and the government alerted the Court that the government anticipated filing a second information charging Leung with the second passport fraud and that Leung would plead guilty to both offenses.

Shortly after the terrorist attacks on September 11, 2001, however, Leung concocted an elaborate scheme to avoid prosecution for the frauds. Pretending to be his own fictional brother, "Jeffrey Leung," Leung falsely reported to his attorney that Steven Leung had died in the attacks, a report that his attorney unwittingly relayed to the District Court. Shortly thereafter, Leung again posed as another fictional brother, "William Leung," in an attempt to obtain a death certificate for Steven Leung from the New York City Law Department World Trade Center Unit ("Law Department"). In this effort, he telephoned the Law Department to report that Steven Leung had worked at the brokerage firm Cantor Fitzgerald in the World Trade Center and had died in the attacks. After his initial request for a death certificate was denied for lack of documentation, Leung followed up by faxing a letter from "William Leung" to the Law Department that included a fabricat-

ed email exchange between Steven Leung and Scott Schertzer, a deceased human resources manager at Cantor Fitzgerald whose name Leung found by searching the Internet. The phoney email exchange purported to show that Steven Leung had begun working at Cantor Fitzgerald a week before the attacks to establish the inference that he had died on September 11.

Prior to a court conference scheduled for December 2001, the District Court received a suspicious telephone call from an individual who refused to identify himself and inquired whether, if Leung failed to appear for the conference, the government would seek to dismiss the information pending against him or whether it would seek the issuance of an arrest warrant. Leung did not appear at the conference. Although no one knew for sure at that time whether Leung was still alive, the District Court granted the government's request for an arrest warrant.

The U.S. Marshals Service expended a substantial amount of time and effort investigating the claim by Leung's purported brothers that Leung had died in the attacks. At least two Deputy Marshals worked on the investigation for three to four hours each business day for over a month. Working with the New York City Police Missing Persons Unit, the Law Department, and Cantor Fitzgerald's insurance company, the Deputy Marshals interviewed family members, former employers, Cantor Fitzgerald employees, Leung's former landlords and neighbors, and others. They also obtained hundreds of documents from companies, including United Airlines and the Bellagio Casino in Las Vegas, concerning Leung's travel. Various teams of Deputy Marshals additionally conducted surveillance on eight different days. After eventually determining that Leung was

still alive, the Marshals finally found and arrested Leung in February 2002.

In May 2002, the government filed a second information charging Leung with three additional counts: Count One charged him with committing passport fraud in violation of 18 U.S.C. § 1542 in connection with his September 1999 New York passport application. Count Two charged him with bail jumping for failing to appear as required on the Hawaii passport charge in violation of 18 U.S.C. § 3146, and Count Three charged him with obstruction of justice in violation of 18 U.S.C. § 1503 for attempting to fake his death. In June 2002, Leung pleaded guilty, without a plea agreement, to all four counts in the Hawaii and New York informations.

The District Court sentenced Leung in November 2002. It began by dividing the four counts into two groups. *See* U.S.S.G. § 3D1.1 (2002). The first group contained the Hawaii passport fraud count, the bail-jumping count, and the obstruction-of-justice count. The second group contained only the New York passport fraud count. The Court applied a 3–level enhancement to the first group for substantial interference with the administration of justice under section 2J1.2(b)(2), yielding an offense level of 18.[2] With respect to the second group, the Court applied an obstruction enhancement under section 3C1.1, yielding an offense level of 10.[3] Combining the groups, the Court found that they constituted 1½ units because the offense levels for each group were 8 levels apart and,

accordingly, added 1 level to the group with the highest offense level (the Hawaii passport group), resulting in a total offense level of 19. *See id.* § 3D1.4(b). It then reduced that level by 2 (but not 3) points to 17, after finding that Leung had accepted responsibility under section 3E1.1(a). But it also granted the government's request for an upward departure pursuant to sections 5K2.0 and 5K2.7, increasing the offense level by 6, to 23. The resulting imprisonment range, with a Criminal History Category I, was 46–57 months, and the Court sentenced Leung principally to 48 months' imprisonment on each count, to be served concurrently. Leung appeals.

## DISCUSSION

■  Leung lodges four challenges to the District Court's Guidelines calculations. He contends that the Court erroneously: (1) applied a 3–level enhancement for substantial interference with the administration of justice under section 2J1.2(b)(2); (2) failed to group together the Hawaii obstruction and New York passport charges under section 3D1.2(c); (3) failed to give an additional 1–level reduction for acceptance of responsibility pursuant to section 3E1.1(b); and (4) departed upwardly 6 levels under sections 5K2.0 and 5K2.7. We review legal interpretations of the Sentencing Guidelines *de novo* and factual findings supporting a district court's offense calculation for clear error. 18 U.S.C. § 3742(e); *United States v. McSherry,* 226 F.3d 153, 157 (2d Cir.2000).

**2.** An obstruction-of-justice offense receives a base offense level of 12. U.S.S.G. § 2J1.2(a) (2002). Because Leung committed the obstruction while on release for the Hawaii passport fraud count, the offense level was enhanced 3 levels to 15. *See id.* § 2J1.7. Applying the additional 3–level enhancement for substantial interference with the administration of justice, pursuant to section

2J1.2(b)(2), brings the offense level to 18. Leung challenges only the 3–level enhancement under section 2J1.2(b)(2).

**3.** Passport fraud receives a base offense level of 8. *Id.* § 2L2.2(a). Application of the 2–level obstruction enhancement under section 3C1.1 results in an offense level of 10.

## I. Substantial Interference with the Administration of Justice

█ If an obstruction-of-justice offense resulted in "substantial interference with the administration of justice," then the offense level is enhanced 3 levels. U.S.S.G. § 2J1.2(b)(2). Application Note 1 to section 2J1.2 lists as an example of such substantial interference "the unnecessary expenditure of substantial governmental or court resources." *Id.* § 2J1.2, cmt. n. 1.

In applying this enhancement, the District Court largely based its findings on the additional expenditure of resources by the U.S. Marshals involved in tracking down and arresting Leung after he feigned his death and failed to appear in court. Specifically, the Court expressed its agreement with the government that the additional burden on the Marshals was significant: "This is not the ordinary bail-jumping case, for lots of reasons, perhaps that the Marshals Service did make an extra effort to find Mr. Leung, and I think that there was substantial interference with the administration of justice as a result of what Mr. Leung did." Tr. of Nov. 25, 2002 at 15.

█ In reviewing sentencing enhancements, we must "give due deference to the district court's application of the guidelines to the facts." 18 U.S.C. § 3742(e); *accord United States v. Molina,* 106 F.3d 1118, 1121 (2d Cir.1997). "The factors underlying a sentence need only be proved by a preponderance of the evidence, and the district court's findings of fact will not be disturbed unless clearly erroneous." *United States v. DeSalvo,* 26 F.3d 1216, 1224 (2d Cir.1994) (quoting *United States v. Jones,* 900 F.2d 512, 521 (2d Cir.1990)); *accord United States v. Weissman,* 195 F.3d 96, 100 (2d Cir.1999).

Leung contends that the District Court erred by applying the enhancement because the government did not show that,

but for his conduct, the resources would not have been expended. He does not challenge the government's description of the time and effort expended by the Marshals, but claims that, since he had stopped faking his death by the time he failed to appear in court, and since he had violated his bail conditions and was separately charged with bail jumping, the efforts expended to arrest him were neither "substantial" nor "unnecessary" but simply the ordinary consequence of his jumping bail. Leung also claims that the District Court's findings were too "tentative" and "conditional" with respect to the extent of the Marshals' efforts to support the enhancement. We disagree.

While there may have been some overlap between the expenditure of governmental resources due to Leung's obstruction and the expenditure of resources as a consequence of his bail-jumping, it is clear that, by faking his death, Leung forced the government to expend substantial additional resources which otherwise would have been unnecessary. At the time of the December 2001 court conference, no one involved—including Leung's counsel—knew whether he was alive. To determine whether Leung had, in fact, survived the September 11th attacks, numerous Marshals had to spend significant time consulting with the Law Department, the Missing Persons Unit, and Cantor Fitzgerald as well as conducting interviews with family members, former employers, and others. Assuming, as Leung contends, that he stopped faking his death by the time he failed to appear in court, his contention overlooks the fact that the government had expended substantial time and resources in dealing with the consequences of his "death" since he took no steps to correct the misunderstanding he purposely created. We therefore find no error in the District Court's conclusion that Leung's

actions caused the unnecessary expenditure of substantial government resources.

In addition, we find no fault with the specificity of the District Court's findings on this issue. The Court expressly "agree[d]" with the government's arguments set forth in its sentencing papers and at the sentencing hearing, which detailed the Marshals' efforts,[4] and it expressly stated its belief that "the Marshals Service *did make* an extra effort to find Mr. Leung" as a result of Leung's faking his own death. Tr. of Nov. 25, 2002 at 15 (emphasis added). These findings are sufficient to support the enhancement.

## II. Grouping Analysis

■ Under the Sentencing Guidelines, the offense level for a defendant convicted of multiple counts is calculated by grouping closely related offenses. U.S.S.G. § 3D1.1. Specifically, "[a]ll counts involving substantially the same harm shall be grouped together into a single Group." *Id.* § 3D1.2. A relevant example of counts involving substantially the same harm is a count that embodies conduct that is treated as an adjustment to the guideline applicable to a different count. *Id.* § 3D1.2(c). The offense level applicable to such a group of offenses is equal to the level for the most serious offense within the group, including all adjustments thereto. *Id.* § 3D1.3(a) & cmt. n. 1. After the offense levels have been established for each group, they are consolidated into a single, combined offense level based on the relative severity of each group. *See id.* § 3D1.4.

Here, as discussed earlier, the District Court divided Leung's convictions into two groups: the first consisting of the Hawaii passport fraud, bail-jumping, and obstruction counts, and the second containing solely the New York passport fraud count. The Court arrived at an offense level of 18 for the first group based on the obstruction count and, in calculating the offense level for the second group, applied a 2–level enhancement for obstruction to the New York passport fraud count based on the same behavior underlying the obstruction count in the first group. That calculation resulted in an offense level of 10 for the second group, and because the offense levels for the two groups were 8 levels apart, an additional level was added, resulting in a combined offense level of 19.

Leung challenges this grouping analysis, contending that the District Court erroneously failed to place all the counts into a single group. He contends that section 3D1.2(c) requires the obstruction count to be grouped with the New York passport count. The District Court's failure to do so, according to Leung, resulted in impermissible double counting and in an improper 1–level increase in his combined offense level because the obstructive conduct was counted both to create the first group and then again to increase the offense level for the second group. We agree.

The District Court's enhancement of the New York passport count by two levels for obstruction of justice under section 3C1.1, while at the same time separately grouping an obstruction count predicated on the same underlying behavior, violated section 3D1.2(c). That provision mandates the grouping of counts "[w]hen one of the

---

**4.** We have repeatedly explained that "[i]n order to warrant a substantial interference with justice enhancement, the government need not 'particularize a specific number of hours expended by government employees.'" *Weissman,* 195 F.3d at 100 (quoting *DeSalvo,*

26 F.3d at 1224); *accord Jones,* 900 F.2d at 522. Here, the government reasonably documented the Marshals' efforts, and the record is clear that the District Court credited those representations in finding that the Marshals made an "extra" effort to locate Leung.

counts embodies conduct that is treated as a[n] ... other adjustment to[ ] the guideline applicable to another of the counts." *Id.* § 3D1.2(c). As Application Note 5 to section 3D1.2 makes clear:

> Subsection (c) provides that when conduct that represents a separate count, *e.g.,* bodily injury or obstruction of justice, is also a specific offense characteristic in or other adjustment to another count, the count represented by that conduct is to be grouped with the count to which it constitutes an aggravating factor. This provision prevents "double counting" of offense behavior.

*Id.* § 3D1.2(c), cmt. n. 5. This provision, as its commentary demonstrates, mandated the grouping of the obstruction count and the New York passport fraud count once the Court enhanced the latter by 2 levels based on the same obstructive behavior.

The government argues that passport offenses must always be separately grouped under subsection (d) of section 3D1.2, and it relies primarily on *United States v. Hersh,* 297 F.3d 1233, 1239 n. 8, 1250 (11th Cir.2002), and *United States v. Owolabi,* 69 F.3d 156, 161, 162–67 (7th Cir.1995), in arguing that the Guidelines permit the enhancement of multiple groups for the same obstructive conduct, and that when imposing such an enhancement, otherwise separate groups need not be combined.

Subsection (d) and the cases cited by the government, however, are inapposite. Application Note 1 to section 3D1.2 explains that "[s]ubsections (a)-(d) set forth circumstances in which counts are to be grouped together into a single Group. Counts are to be grouped together into a single Group *if any one* or more of the subsections provide for such grouping." *Id.* § 3D1.2 cmt. n. 1 (emphasis added).

In other words, subsection (d) has no bearing on whether subsection (c) mandates grouping in this case. In addition, the cases cited by the government merely involve the tangential issue of applying section 3C1.1's 2–level obstruction enhancement to separate counts and groups, but do not address the precise issue before us—the application of section 3D1.2(c) where the obstructive behavior underlying one count is used to enhance a separately grouped count. *See Hersh,* 297 F.3d at 1238, 1239 & n. 8, 1241 & n. 9, 1250 (defendant did not challenge obstruction enhancement on appeal or raise issue of grouping under section 3D1.2(c)); *Owolabi,* 69 F.3d at 158, 161, 162–67 (obstructive behavior underlying section 3C1.1 enhancement did not underlie any of the three counts involved). By contrast, where, as here, a count is predicated on conduct that is used to enhance a separately grouped count, and the two counts are not grouped together under section 3D1.2(c), this Court and others have found error. *See, e.g., United States v. Baez,* 944 F.2d 88, 90 (2d Cir.1991) (finding error in district court's failure to group counterfeiting and witness tampering counts under section 3D1.2(c), where the court had enhanced the offense level for the counterfeiting count by 2 levels under section 3C1.1 for obstruction of justice based on the same conduct underlying the witness tampering count); *United States v. Hankins,* 931 F.2d 1256, 1264–65 (8th Cir.1991) (finding error in district court's failure to group bank robbery and escape counts under section 3D1.2(c), where court had enhanced bank robbery count by 2 levels for obstruction of justice under section 3C1.1 based on conduct underlying escape count).[5] For these reasons, we hold that the District Court erred by failing to

---

**5.** In light of our conclusion, we need not reach Leung's argument that subsection (b) also requires the grouping of his passport fraud counts.

group the obstruction count with the New York passport count.

## III. Acceptance of Responsibility

■■ Section 3E1.1 provides up to a 3–level reduction in a defendant's combined offense level for acceptance of responsibility. The court may reduce the offense level by 2 under subsection (a) of that provision "[if] the defendant clearly demonstrates acceptance of responsibility for his offense." U.S.S.G. § 3E1.1(a). Subsection (b) provides an additional 1–level reduction if, in addition to qualifying under subsection (a), the defendant (1) has an offense level of 16 or greater and (2) timely provides complete information to the government about his own involvement in the offense or timely notifies authorities of his intention to plead guilty. *Id.* § 3E1.1(b). If a defendant qualifies, "[a]pplication of subsection (b) is not discretionary." *United States v. Rood,* 281 F.3d 353, 356 (2d Cir.2002) (citing *United States v. Keppler,* 2 F.3d 21, 23 (2d Cir.1993)).

At sentencing, the District Court reduced Leung's offense level by 2 under subsection (a) after finding that Leung had "admitted his guilt, including admitting the obstruction and admitting the failure to appear." Tr. of Nov. 25, 2002 at 15. It made no findings, however, with respect to the additional 1–level reduction under subsection (b), and Leung contends that the Court erred by failing to award it. Leung claims that because his offense level exceeded 16 and because he immediately notified the government of his intention to plead guilty, he was entitled to the additional 1–level reduction. *See Rood,* 281 F.3d at 356.

The government offers no opposition on the merits to this contention, but, instead, contends that Leung waived the argument by failing to raise it below. Specifically, the government contends that he "inten-tionally abandoned his right to challenge Judge Chin's decision to apply only a two-level enhancement so as not to risk Judge Chin's revisiting the role of acceptance entirely." Appellee's Br. at 33. For a host of reasons, we disagree.

■ Leung requested a 3–level reduction in his November 15, 2002 sentencing submission. The District Court indicated at the sentencing hearing that it had received and reviewed that submission. Tr. of Nov. 25, 2002 at 2. In addition, Leung's counsel reiterated at the sentencing hearing that he was seeking a 3–level reduction in response to the Court's indication that it was considering 2 levels. As these facts clearly demonstrate, no waiver occurred. Because the District Court did not make the pertinent findings under section 3E1.1(b) we remand to permit it to consider whether or not Leung qualifies for the additional reduction under subsection (b). *See Rood,* 281 F.3d at 356.

## IV. Upward Departure

■ Finally, Leung challenges both the District Court's decision to depart upwardly under sections 5K2.0 and 5K2.7 and the extent (6 levels) of the departure. In upwardly departing, the Court began by acknowledging that passport fraud usually results in a probationary sentence for a first time offender, and "there is little doubt that if Mr. Leung had simply faced the music here, he would have gotten probation, without a record." Tr. of Nov. 25, 2002 at 35. However, the Court found Leung's behavior "despicable" and "complete[ly] selfish[ ]" and then went on to conclude:

In the end, I am just extremely troubled. I don't think it's a matter of mere reflexes. Of course, there is a lot of emotion involved, but that's why it is an extraordinary case. I mean, this is different. It is different. And I'm going

to deny the motion for a downward departure. I am going to grant the government's motion for an upward departure.

... I think some of the details help show us that indeed this was egregious conduct. Within days after 9/11, with all that was going on, Mr. Leung lied to his lawyer, found suitable candidates of individuals who had been killed and tried to take advantage of that. He tried to commit a fraud on the Court. He tried to commit a fraud on the city. There was a diversion of resources, not just by the Marshals Service but by the Law Department and Cantor Fitzgerald, which obviously didn't need to deal with this.

In any event, I'm going to upwardly depart six levels to a level 23, and the range is 46 to 57 months.

*Id.* at 36–37. The 6–level departure permitted the imposition of the 48–month sentence received by Leung, which was 18 months above the otherwise applicable guideline range. Leung's counsel asked the Court to reconsider, suggesting that perhaps emotional considerations unduly influenced the sentence and that it was out of proportion with other sentences imposed in cases involving the attacks of September 11th. The Court responded:

... I don't believe that emotion is unduly affecting my judgment here. There is no doubt emotion comes into play to some extent. Emotion comes into play in every sentencing decision. Every sentencing decision, to a degree, obviously. Emotion comes into play when the Court downwardly departs or the Court shows compassion and imposes a sentence that is lower than one would expect, and that happens. When you were a prosecutor in a case before me and I sentenced the defendants to what I thought was a relatively high sentence, emotion came into play. Emotion always does. Obviously, however, you can't let emotion cloud your judgment, and I don't believe I have done that here.

There are differences in some of those other cases. Of course it's hard to compare them, but, I think, I would guess that less thought went into some of those others. Those others were not as premeditated as this crime here. Mr. Leung thought this through, he did research, he identified individuals who were killed. I mean, it's a different kind of a thing, and so I understand your point. I don't believe I am overreacting from an emotion point of view. I would not be completely frank if I said that emotion had no play, but, again, I don't think it comes into play any more than in many of the sentences that I impose.

*Id.* at 39–40. In departing, the Court expressly relied on sections 5K2.7 and 5K2.0 and adopted "many" of the arguments and statements in the government's sentencing papers. *Id.* at 41–42.

█ Prior to April 30, 2003, we reviewed a district court's decision to depart, as well as the extent of a departure, for abuse of discretion. *See United States v. Cotto,* 347 F.3d 441, 445 (2d Cir.2003); *United States v. Simmons,* 343 F.3d 72, 78 (2d Cir.2003). Congress, however, changed this standard in the Prosecutorial Remedies and Other Tools to End the Exploitation of Children Today Act of 2003 ("PROTECT Act"), Pub.L. No. 108–21, § 401(d)(2), 117 Stat. 650, 670 (codified as amended at 18 U.S.C. § 3742(e) (2003)). As of April 30, 2003, the effective date of the PROTECT Act, we review a district court's decision to depart *de novo. See* 18 U.S.C. § 3742(e)(3)(B)(iii) (court of appeals shall review *de novo* whether a departure is "justified by the facts of the case"); *Cotto,* 347 F.3d at 445; *Simmons,* 343 F.3d

at 78. We have not yet resolved whether this new standard of review applies to appeals pending before April 30, 2003 and in this case we are not called on to do so because we would affirm under either standard. *See Simmons,* 343 F.3d at 78.

We find no fault with the District Court's decision to depart.[6] Section 5K2.0 permits departures if " 'there exists an aggravating or mitigating circumstance of a kind, or to a degree, not adequately taken into consideration by the Sentencing Commission in formulating the guidelines that should result in a sentence different from that described.' " U.S.S.G. § 5K2.0 (quoting 18 U.S.C. § 3553(b)(1)). Such circumstances will, of course, be rare. *See Koon v. United States,* 518 U.S. 81, 96, 116 S.Ct. 2035, 135 L.Ed.2d 392 (1996); *United States v. Tappin,* 205 F.3d 536, 540 (2d Cir.2000); *United States v. Merritt,* 988 F.2d 1298, 1309 (2d Cir.1993). They "cannot, by their very nature, be comprehensively listed and analyzed in advance" and must be determined by the sentencing court "on a case-specific basis." U.S.S.G. § 5K2.0. A circumstance that is " 'not ordinarily relevant' in determining whether a sentence should be outside the applicable guideline range may be relevant ... if [it] is present to an unusual degree and distinguishes the case from the 'heartland' cases covered by the guidelines." *Id.*

Where an unusual constellation of factors exists that removes any sentencing from the "heartland" cases, district courts are obligated to consider departures even though no one factor, standing alone, might justify an upward or downward departure. *See* U.S.S.G. § 5K2.0, cmt. ("The last paragraph of this policy statement sets forth the conditions under which an offender characteristic or other circum-

stance that is not ordinarily relevant to a departure from the applicable guideline range may be relevant .... The Commission does not foreclose the possibility of an extraordinary case that, because of a combination of such characteristics or circumstances, differs significantly from the 'heartland' cases covered by the guidelines in a way that is important to the statutory purposes of sentencing, even though none of the characteristics or circumstances individually distinguishes the case."); *United States v. Rioux,* 97 F.3d 648, 663 (2d Cir.1996) ("In extraordinary cases, however, the district court may downwardly depart when a number of factors that, when considered individually, would not permit a downward departure, combine to create a situation that 'differs significantly from the 'heartland' cases covered by the guidelines.' ") (quoting U.S.S.G. § 5K2.0, cmt.); *United States v. Milikowsky,* 65 F.3d 4, 7 (2d Cir.1995) ("This court has taken this guidance firmly to heart in recent years, making clear that a district court not only can, but must, consider the possibility of downward or upward departure 'when there are compelling considerations that take the case out of the heartland factors upon which the Guidelines rest.' ") (quoting *United States v. Monk,* 15 F.3d 25, 29 (2d Cir.1994)).

Leung claims that September 11th was only "tangentially involved" and thus cannot serve as a basis for departure, or else upward departures would be "warranted for all defendants who committed crimes after September 11th, and thereby diverted law enforcement resources to investigate and arrest them." Appellant's Br. at 39. The District Court, however, did not grant the upward departure merely because this case involved September 11th or because Leung's actions resulted in an un-

---

**6.** In light of our conclusion, we need not reach Leung's argument that the District

Court also incorrectly departed under section 5K2.7.

necessary additional expenditure of government resources. The District Court departed after careful consideration of the inter-relationship of a constellation of factors that it concluded took this case outside the heartland of obstruction cases. Leung concocted and went a considerable distance towards executing an elaborate scheme to feign his death in an attempt to avoid prosecution for serious criminal conduct. Among other things, he lied to his attorney, researched the identities of individuals killed in the attacks, and attempted to commit a fraud on the Court and New York City. The added burdens this conduct imposed on the government were substantial ones occurring at a time when law enforcement resources were desperately needed elsewhere. Following our *de novo* review, we hold that this particular combination of circumstances was sufficiently removed from the garden variety of obstruction cases such that a departure from the Guidelines range was warranted.

 Similarly, we have little difficulty concluding that the extent of the departure was not "unreasonable." 18 U.S.C. § 3742(e)(3)(C) (court of appeals shall "give due deference" in reviewing whether "the sentence departs to an unreasonable degree"). In reaching this determination, we look to the " 'amount and extent of the departure in light of the grounds for departing' and 'examine the factors to be considered in imposing a sentence under the Guidelines, as well as the district court's stated reasons for the imposition of the particular sentence.' " *United States v. Campbell*, 967 F.2d 20, 26 (2d Cir.1992) (quoting *Williams v. United States*, 503 U.S. 193, 194, 112 S.Ct. 1112, 117 L.Ed.2d 341 (1992)). "The key question is whether the 'reasons given by the district court ... are sufficient to justify the magnitude of the departure.' " *Id.* (quoting *Williams*, 503 U.S. at 204, 112 S.Ct. 1112). We do not believe the 6–level departure, resulting in eighteen additional months' imprisonment, was unreasonable considering the Court's view—for all the reasons discussed above—that this was an "extraordinary case" and that Leung's conduct had been "egregious." Tr. of Nov. 25, 2002 at 15, 36. We therefore affirm the departure.

## CONCLUSION

For the foregoing reasons, the judgments of the District Court are affirmed in part and vacated in part, and this case is remanded for resentencing consistent with this opinion.